THE WINFIELD NATIONAL BANK v. BARBARA CROCO *et al.*

1. MORTGAGE, *Obtained by Fraud—Cancellation.* If a creditor obtains the signatures of a man and his wife to a mortgage to secure a debt upon which the man is surety, by representations that the instrument is not a mortgage but simply a paper to protect the man from arrest and imprisonment for an offense committed, and it appears that they are old people, whose eye-sight is so impaired that they cannot read the writing in the mortgage presented to them for signing, such mortgage will, in a proper proceeding promptly begun, be declared invalid, and will be canceled.

2. ——— *Obtained by Threats of Criminal Prosecution.* If the creditor operated upon the fears of the husband by threats of arrest and imprisonment, believed by him to be imminent, and thus overcame his will, and through fear and undue influence compelled him to sign the mortgage, the signature is not binding; and if the wife was induced to execute the mortgage from fear excited by threats made to her by the creditor of an illegal criminal prosecution against her husband, the instrument thus obtained will not be binding upon her.

3. FINDING, *Sustained.* The testimony in the case examined, and *held* to be sufficient to sustain the finding of the court that the mortgage in controversy is invalid.

4. NEW TRIAL—*Bias of Court.* The mere expression of the opinions of witnesses that the court entertained bias and prejudice for and against some of the parties in the action, without a statement of the facts and grounds upon which such opinions were founded, cannot, be regarded as testimony, and is entitled to no consideration in an application for a new trial.

### *Error from Cowley District Court.*

ACTION to set aside a certain mortgage. Judgment for plaintiffs, *Barbara Croco* and husband, on January 3, 1890. The defendant *Bank* brings the case to this court. The material facts are stated in the opinion.

*Peckham & Peckham,* for plaintiff in error.

*McDermott & Johnson,* and *S. E. Fink,* for defendants in error.

The opinion of the court was delivered by

JOHNSTON, J.: This was an action brought in the district court of Cowley county by Barbara Croco and John Croco to cancel and set aside a mortgage executed by them to the Winfield National Bank on February 20, 1889. It was alleged that the property mortgaged was the homestead of Barbara Croco and John Croco, situated in Winfield, and a farm near to Winfield, and that both the homestead and the farm were owned by Barbara Croco. The plaintiffs below averred that the signatures to the mortgage were obtained by fraudulent representations, duress, intimidation, and threats of injury. They averred that the pretended mortgage was procured without any consideration, and without any knowledge on their part of its contents, but, on the contrary, that the bank and its agents, with the intent to defraud them, falsely represented that the instrument was not a mortgage, but was a paper necessary to be executed to keep John Croco from being criminally prosecuted and imprisoned. They alleged that they were unable to read, and did not read or hear the instrument read, and were not aware of its contents at the time of signing the same. They further said that the acknowl-

edgment of the mortgage was taken by G. H. Schuler, a stockholder and officer of the bank, but that he did not inform them, or either of them, that the instrument was a mortgage, or that he was attempting to take their acknowledgment to a mortgage. The bank denied all the averments of fraudulent representations and duress alleged in the petition, and stated that the mortgage was procured from the Crocos in the ordinary course of business and for a valid consideration, to secure the payment of a promissory note executed by P. C. Croco and John Croco, for the sum of $5,405. The case was submitted to the court upon conflicting testimony, and the claims of the plaintiffs below were sustained, it being held that they did not voluntarily or legally execute or acknowledge the mortgage, and that it was without consideration, and void.

It is not disputed that the instrument sought to be canceled in this proceeding was signed by John Croco and Barbara Croco on February 20, 1889. The name of John Croco was signed to it in a back room of the bank, in the presence of the officers, and the name of Barbara Croco was attached to it at her home, in the absence of her husband, and when no one was present but G. H. Schuler, an officer of the bank. It further appears, without question, that Barbara Croco was the owner of the property described in the mortgage, and that she was in no way indebted to the bank. Peter C. Croco, a son, was largely indebted to the bank, and his father, John Croco, had signed, as surety, with him a note of $5,405 held by the bank. When the mortgage was signed by John and Barbara Croco, Peter was insolvent, and the officers of the bank, learning of his financial condition, were actively endeavoring to obtain security for his indebtedness to the bank. The record does not disclose the ages of John and Barbara Croco, but they are spoken of as old people, and the testimony is that the eye-sight of each was greatly impaired. The testimony of John Croco with reference to the signing of the mortgage, in substance, is, that on the morning of February 20, 1889, he started to the railway depot to take the train for

the town of Floral to visit his daughter; that while waiting for the train at the depot J. N. McDonald, the vice-president of the bank, came in, and invited him to return to the bank, but Croco declined. McDonald insisted that he must go to the bank as there was urgent business, and picking up Croco's valise, he started toward the bank with it, and finally Croco reluctantly accompanied him. He was taken to a back room in the bank building, where McDonald sat down and commenced writing. Shortly afterward, George H. and Everett Schuler came into the room, and the paper upon which McDonald had been writing was presented to Croco for signature. Croco inquired what the nature of the paper was, stating that he had not his glasses and was unable to read what was upon the paper. He was told that it was for the purpose of keeping the United States officers from arresting him upon the charge of obtaining money under false pretenses; that money had been obtained from the bank upon the note signed by him; that it was a United States bank, and that they must telegraph the United States officers at Washington by noon that day if the paper was not signed, and that they would telegraph to the marshal or some other officer at Kansas City, who would proceed to Winfield and arrest him. George H. Schuler sat down and wrote a dispatch which he held up in Croco's face, saying that there was a dispatch that would go to Washington if he did not sign that paper, and that the officers there would telegraph and cause him to be arrested and taken to Leavenworth. Everett Schuler made a similar statement and argument, and McDonald pushed the paper over to him and said if he would sign it now that he would be all right. Croco said he repeatedly asked what the paper was, and to have it read, and at each time was told that it was simply to protect him from prosecution and arrest. He states that he declined to sign, and that he arose and started for the door, telling them that he would go and see his lawyer, and, if his lawyer said it was right to sign the paper, he would do so, when George H. and Everett Schuler jumped to their feet and sharply said that he could not go, but must sign the paper. Dr. Perry, another

director of the bank, came in and joined with the others in an effort to obtain his signature to the paper. He had been a friendly neighbor of Croco's, and he talked pleasantly to him and advised him to sign it and avoid trouble, and that if he did not, the officers at Washington would be notified at once. He was repeatedly told that if he did not sign it before 12 o'clock, the telegram would be sent, and about 15 minutes before 12 he signed the paper. He said that he was at no time informed that it was a mortgage, and was told that it was not intended to affect his or his wife's property. After he had written his name, George H. Schuler tore up the dispatch, and when they started from the room they found that the doors of the same were locked. After leaving the bank, he stated to Schuler that he was going to the office of his lawyer to consult him. When he started up stairs to the law office, he set his valise down, and Schuler informed him that he would not go up. Croco found the office door locked and started for the residence of his lawyer, but when he came down stairs he found that Schuler had gone and taken the valise with him. Soon afterward he reached home, and found that George H. Schuler had been there and obtained the signature of his wife.

Barbara Croco testified to the effect that, about noon of the day on which the mortgage was signed, she was at home alone, lying in bed, having been sick for some time; that she heard some one rapping at the back door of her house, and on going to the door saw a stranger, who proved to be George H. Schuler, standing there; that he spoke to her, and stated that he had brought Mr. Croco's satchel home, when she inquired what had happened to her husband, and she says that it occurred to her that he had been injured or killed. He walked into the room and presented a paper to her to sign, and when she inquired the nature and purpose of the paper she was told that Peter Croco had made an assignment; that the bank had telegraphed to Washington. and the officers would come tomorrow and arrest her husband. She stated that he told her that the paper presented was simply to protect Mr. Croco from

the officers, and from arrest. She told him that she could not read the writing, and asked him what it was, when he replied again that it was simply to protect them; that Mr. Croco had signed it, and that if she refused, Mr. Croco would be arrested on the next day. After a good deal of talk of a similar character, and that if her husband was arrested he would be handled roughly, she stated that she became alarmed and anxious for the safety of her husband, and signed the paper. Between 5 and 10 minutes after her signature was attached, her husband returned home. She stated that Schuler never intimated that the paper was a mortgage upon her property, nor inquired whether she acknowledged the execution of the same as a mortgage, and that in fact she did not know that it was a mortgage until the following day. The mortgage was taken to the office of the register of deeds at once for record.

An employé in the register's office testified that he heard a conversation between McDonald and another employé in the register's office with respect to the signing of the mortgage, and while he did not remember the exact language used by McDonald, it was to the effect that they took Croco into the bank and made him sign the mortgage; that one of the Schuler boys went down to the house and got old lady Croco to sign it; and that he thinks he used the term "bull-dozed" in speaking of the manner in which they had obtained the mortgage.

The bank assails the finding and judgment upon the ground that they are not sustained by sufficient evidence, but if we accept the testimony of the Crocos to be true, as we must, there can be no question that it abundantly supports the finding of fraud and invalidity. Taking their testimony to be true, it is inevitable that their signatures were obtained by a gross deception and a species of duress. It should be stated that the officers of the bank emphatically deny that there were any misrepresentations or any threats made to induce either Croco or his wife to execute the mortgage. They state that Croco went to the bank without any compulsion; that the mortgage was drawn up in his presence, and its nature explained to him;

40—46 KAS.

that they reminded him of his representations as to the property and solvency of himself and his son, made before that time as a basis for credit, and urged him to make good those assurances by tangible security.    In the argument, it is said: "The old man was unable to withstand these proper appeals to his moral sense, and thus gave the securities, not very freely we admit, but with thorough knowledge of what he was doing, and not under such circumstances as to entitle him to any relief in a court of equity."

Some things in the testimony of Croco would sustain the theory of the bank, and indicate that he may have known the character of the paper he was signing.    For instance, he admits that when the mortgage was in course of preparation, McDonald inquired the name of Croco's wife, and also made inquiry in regard to the extent and description of Peter Croco's land.    On the other hand, some circumstances are shown by the testimony of the bank which tend to sustain the claim that there was both fraud and duress in procuring the signatures to the mortgage.    It is admitted that the old man was taken into a rear room of the bank, and that great pressure was required to obtain his signature, and that for more than two hours the four officers of the bank, in turns, labored with him to induce him to sign the paper.    It is admitted that a telegraphic dispatch was written in his presence about 12 o'clock — the hour mentioned by Croco — and a statement was made to him that if the matter was not satisfactorily arranged, the telegram would be sent; but it is claimed that it was a telegram to Schuler's father.    It is also admitted that some of them may have told Croco that the transaction would be reported to the United States officers at Washington. Then the action of Schuler in hurrying to the home of Croco and obtaining the signature of Mrs. Croco, when he knew that Mr. Croco was absent and endeavoring to find and consult his lawyer in regard to the matter, tends to support the theory of the Crocos.    All these circumstances, and others which we are not possessed of, were before the trial court, and enabled it to determine whether the mortgage was fairly

and voluntarily executed, or whether the signatures to the same were obtained by fraud, fear, and compulsion. Whether the weight of the evidence supports the finding that was made, is not a question in this court now. If there is competent evidence to sustain the same, that is decisive with us. (*Weil v. Eckard*, 37 Kas. 696; *Goodrich v. Magers*, 39 id. 746.) It is true there were more witnesses testified in behalf of the theory and claim of the bank than for that advanced by the Crocos, but the trial court was not obliged to believe their evidence unless it convinced and satisfied its reason and judgment; and the presence of the witnesses, and the circumstances surrounding the transaction and occurring at the trial, no doubt threw considerable light upon the matter, and enabled the court to reach a decision upon testimony which was so contradictory and conflicting. If the officers of the bank

1. Mortgage, obtained by fraud—cancellation. purposely deceived the old people, who could not read the instrument presented for their signatures, in regard to its character, as the Crocos have testified, then the mortgage was invalid, and the decree of cancellation is correct. (*Bird v. Logan*, 35 Kas. 228; *Warden v. Reser*, 38 id. 86.)

If they operated upon the fears of John Croco by threats of illegal arrest and imprisonment, believed by him to be imminent, as he has testified, and thus overcame his will,

2. Mortgage, when not binding upon wife. and through fear and by undue influence compelled him to sign the mortgage, the signature is not binding. "If the wife was induced to execute the mortgage from fear excited by threats made to her by the plaintiffs of an illegal criminal prosecution against her husband, the instrument thus obtained would not be binding upon her." (*Green & Densmore v. Scranage*, 19 Iowa, 461, 466; *Foley v. Greene*, 14 R. I. 618; *Harris v. Carmody*, 131 Mass. 51; *Schultz v. Culbertson*, 46 Wis. 313.)

Barbara Croco was the exclusive owner of the property described in the mortgage, and unless it is binding on her, it cannot be sustained. She did not sign the note upon which her husband was surety, and was not indebted to the bank in

any amount. The note sought to be secured was made December 24, 1888, and did not mature until 90 days thereafter. The mortgage was signed by Barbara Croco and her husband more than 30 days before the maturity of the note, to secure an indebtedness for which she was in no way liable. It is conceded that the note was not then due, that no extension of time was asked or obtained, and no present consideration passed from the bank to her or anyone else at the time of the execution and delivery of the mortgage. It is therefore difficult to discover any consideration that would support the execution of the mortgage by Barbara Croco. Looking at the whole testimony, however, there is no difficulty in saying that there is sufficient to sustain the finding and judgment rendered by the court.

3. Finding, sustained.

The plaintiff in error contends that a new trial should have been granted because of bias and prejudice entertained by the trial court against the officers of the bank. On the motion for a new trial, three affidavits in behalf of the bank were presented by McDonald, Schuler, and Perry, and in behalf of the Crocos, oral testimony was given by one witness, and a statement with reference to the charge of bias and the conduct of the trial was made by the court, and the testimony produced falls far short of sustaining the charge. The statements of the affiants are largely expressions of opinion that the judge was prejudiced against the officers of the bank, and that his conduct during the trial indicated such prejudice, without reciting the facts and circumstances upon which such opinions and statements were based. The mere expression of the opinions of these witnesses, without a statement of the facts or grounds upon which such opinions were based, cannot be regarded as testimony, and is entitled to no consideration. It is stated as a fact, that the court allowed great latitude in the cross-examination of the officers of the bank, but allowed no latitude whatever on the cross-examination of John and Barbara Croco. We find that the record does not sustain this claim. It is also stated that the judge in rendering judgment remarked

4. New trial— bias of court.

that, if he believed the testimony of the Crocos, some of the officers of the bank were criminally liable, and should be proceeded against for a criminal offense; but this is qualified to some extent by the oral testimony and statement of the judge. But, even if the statements imputed to the court in rendering its judgment are accepted, it does not indicate that the court entertained any prejudice at the commencement or during the course of the trial, nor yet at the time the statement was made. If the judge believed the testimony of the Crocos, and that the charge made against the officers of the bank was true, it is quite natural that some strong and severe language should be used; but we find nothing in what was said when the judgment was given, or in the conduct of the judge during the trial, which convinces us that the judge had any bias or prejudice for or against any of the parties to the action.

Judgment affirmed.

All the Justices concurring.